69 U.S. 728 (1864)
2 Wall. 728
LOWBER
v.
BANGS.
Supreme Court of United States.

*730 Mr. Curtis, for the owners.
Mr. S. Bartlett, contra.
*736 Mr. Justice SWAYNE delivered the opinion of the court
The question is, whether it was a condition precedent, that the ship should proceed directly from Melbourne to Calcutta; or, in other words, whether these clauses constitute a warranty, or are merely a representation.
"The construction to be put upon contracts of this sort depends upon the intention of the parties, to be gathered from the language of the individual instrument. Whether particular stipulations are to be considered conditions precedent, or not, must, in all cases, solely depend upon that intention, as it is gathered from the instrument itself."[*] "All mercantile contracts ought to be construed according to their plain meaning, to men of sense and understanding, and not according to forced and refined constructions, which are intelligible only to lawyers, and scarcely to them."[] "The rule has been established, by a long series of adjudications in modern times, that the question whether covenants are to be held dependent or independent of each other, is to be determined by the intention and meaning of the parties, as it appears on the instrument, and by the application of common sense, to each particular case, and to which intention, when once discovered, all technical forms of expression must give way; and one of the means of discovering such intention has been laid down with great accuracy by Lord Ellenborough, in the case of Ritchie v. Atkinson,[] to be this: that when mutual covenants go to the whole consideration, on both sides, they are mutual conditions, the one precedent to the other; but where the covenants go only to a part, then a remedy lies in the covenant to recover damages for the breach of it, but it is not a condition precedent."[§]
*737 Rules have been elaborately laid down, and discussed in many cases, for determining the legal character of covenants, and their relations to each other; but all the leading authorities concur in sustaining these propositions.
Contracts, where their meaning is not clear, are to be construed in the light of the circumstances surrounding the parties when they were made, and the practical interpretation which they, by their conduct, have given to the provisions in controversy.[*]
This charter-party bears date on the 4th day of June, 1858. The vessel was then on her way to Melbourne. The agreed facts warrant the conclusion, that the owner believed confidently that she would reach Melbourne in advance of the mail, which would carry to her master advice of the charter-party. It was also probable that she might engage her freight before the master could receive the advice. On the other hand, it was improbable that she would have discharged her cargo and have left Melbourne before the mail arrived. Hence, no provision was made by the owners for any other contingency than that she should have become engaged. In that event, they were not to be bound; and the charterers required it to be stipulated, simply, that if not engaged, she should proceed with all possible despatch from Melbourne to Calcutta.
Promptitude in the fulfilment of engagements is the life of commercial success. The state of the market at home and abroad, the solvency of houses, the rates of exchange and of freight, and various other circumstances which go to control the issues of profit or loss, render it more important in the enterprises of the trader than in any other business. The result of a voyage may depend upon the day the vessel arrives at her port of destination, and the time of her arrival may be controlled by the day of her departure from the port whence she sailed. We cannot forget these considerations in our search for the meaning of this contract. That *738 the parties could have intended that when the vessel left Melbourne she might wander in any direction over the Indian seas, and that whenever and wherever she should receive intelligence of the contract, she might proceed to Calcutta and claim its fulfilment by the charterers, strikes us as incredible. So to hold, we think, would be to make a new contract for the parties, and not to execute the one they have made. We cannot give any other construction to the language, "the ship to proceed from Melbourne to Calcutta with all possible despatch," than that she was to proceed direct from one place to the other, and that to this extent, at least, time was intended to be made of the essence of the contract. We lay out of view the state of things at Calcutta when the vessel arrived there. To allow that to control our conclusion, would be to make the construction of the contract depend, not upon the intention of the parties when it was entered into, but upon the accidents of the future.
We will now advert to the authorities to which our attention has been directed. Tarrabochia v. Hickie, Dimech v. Corlett, Clipsham v. Vertue, and Freeman v. Taylor, are in point for the defendants in error, and seem to sustain the views of their counsel. In these cases it was held, that unless the delay was so great as to frustrate the object of the charterers in making the contract, it was not material to the rights of the parties. In two of them the delay was produced by the deviation of the vessel from the direct course to the port where she was to receive her lading.
The authorities relied upon in behalf of the plaintiffs in error are equally cogent. In Glaholm v. Hays, the language of the charter-party was, "the vessel to sail from England on or before the 4th day of February next." This was held to be a condition precedent. Chief Justice Tindal said this language imported the same thing as if it had been "conditioned to sail," or "warranted to sail on or before such a day." In Oliver v. Fielden et al., the contract, as set out in the declaration, was that "the ship called the Lydia, ... . then on the stocks at Quebec, to be launched and ready to receive cargo in all the month of May, 1848, and guaranteed *739 by the owners to sail in all June, A.D. 1848," &c., should be loaded by the factors of the charterers, &c. It was held that the readiness to receive a cargo in all May was a warranty, and that in an action for not loading the vessel, a plea stating that the ship was not ready to receive a cargo "in all May," was good on general demurrer. Pollock, Chief Baron, said, "The stipulation as to the vessel being ready to receive a cargo in May is not mere description, but part of the contract, and forms a condition precedent to the plaintiff's right to recover." Crookewit v. Fletcher presented the same point, and was ruled in the same way. In Ollive v. Booker, the vessel was described as "now at sea, having sailed three weeks ago, or thereabouts." It was held, that the time at which the vessel sailed was material, and that the statement in the charter-party amounted to a warranty.
The most recent and most important authority brought to our notice is Behn v. Burness. It was agreed by the charter-party, in that case, that the ship then "in the port of Amsterdam ... should, with all possible despatch, proceed to Newport, in Monmouthshire," and there take in cargo. At the date of the contract the ship was not at Amsterdam, but at another place sixty-two miles distant from there. Being detained by contrary winds, she did not reach Amsterdam until the 23d of October. She discharged her cargo as speedily as possible, and proceeded direct to Newport, where she arrived on the 1st of December. The defendant refused to load her. The plaintiff sued for damages, and the defendant pleaded that the ship was not at Amsterdam at the time of the making of the contract. The Queen's Bench ruled in favor of the plaintiff, and he recovered. The defendant took the case, by a writ of error, to the Court of Exchequer, and that court reversed the judgment of the Queen's Bench. The opinion of the reversing court is characterized by force and clearness, and the leading authorities on the subject are examined. The court say: "We feel a difficulty in acceding to the suggestion that appears to have been, to some extent, sanctioned by high authority (see Dimech v. Corlett), that a statement of this kind in a charter-party, which may *740 be regarded as a mere representation, if the object of the charter-party be still practicable, may be construed as a warranty, if that object turns out to be frustrated, because the instrument, it should seem, ought to be construed with reference to the intention of the parties at the time it was made, irrespective of the events which may afterwards occur." Referring to Freeman v. Taylor, Tarrabochia v. Hickie, and Dimech v. Corlett, they say: "But the court did not, we apprehend, intend to say that the frustration of the voyage would convert a stipulation into a condition, if it were not originally intended to be one." They evidently felt embarrassed by the prior adjudications, which take a different view of the subject, and an effort is made to reconcile them with the decision they were about to pronounce. Here we have no such embarrassment, and we think we shall settle wisely the important principles of commercial law involved in this controversy by following the case of Behn v. Burness.
Upon reason, principle, and authority, we are of opinion that the stipulation before us is a condition precedent, and not a mere representation, nor an independent covenant, and that it goes to the entire root of the contract.
JUDGMENT REVERSED, and the cause remanded for further proceedings, in conformity to this opinion.
Mr. Justice CLIFFORD, dissenting.
I am not able to concur in the judgment of the court in this case, and inasmuch as the questions presented for decision are of general importance, I think it proper to state the reasons for my dissent.
Present defendants, as the owners of the ship Mary Bangs, brought the suit in the court below to recover damages of the charterers for refusing to load the ship as they had covenanted and agreed to do.
Charterers resided in Philadelphia, and the owners of the ship resided in Boston. Charter-party was executed by the defendants at Philadelphia, on the ninth day of June, 1858, and was received by the plaintiffs in Boston on the eleventh *741 of the same month. Contract was for a voyage from Calcutta to Philadelphia, New York, or Boston, one port only, at charterers' option; but they were to give the necessary orders upon the subject before the ship sailed from Calcutta. When the contract was made the ship was "on her passage from New York to Melbourne," as appears by the introductory recitals of the charter-party.
Voyage is described, as before mentioned, and immediately following that description is the clause which gives rise to the controversy. "Ship to proceed from Melbourne to Calcutta with all possible despatch." Owners engaged, among other things, that the vessel should be kept seaworthy, and be provided with men and provisions, and with every requisite during the voyage. On the other hand, the charterers engaged to load the ship, and to provide, as part of the cargo, sufficient saltpetre for ballast, and what broken stowage the master might require, so that the ship might be loaded full and in a safe and seaworthy manner, and to reasonable draft. Price to be paid for the charter was thirteen dollars per customary ton for whole packages, and half price for broken stowage. Forty running lay days were allowed for loading the ship, and the charterers agreed to pay ninety dollars demurrage for every day the ship should be detained beyond that time, if the detention was by their fault or that of their agent.
Recitals of the charter-party also show that the vessel sailed from New York, on her passage to Melbourne, on the third day of May, prior to the date of the charter, and the parties agree that such a voyage usually occupied from ninety to one hundred and thirty days, and that it would usually require from two to seven weeks for the vessel to discharge her cargo and get ready to sail. Terms of the charter-party required that the owners should use the most direct means to forward instruction to the master, with a copy of the charter, ordering it to be fulfilled, and the agreed statement shows that on the same day they received the charter-party from Philadelphia they complied with that stipulation.
*742 First instructions were sent by a sailing vessel; but they also sent similar instructions by the overland mail, and in various other ways. Copies of the same instructions were also sent to Singapore and Batavia; and in fact the parties agree that there were no more direct means for forwarding instructions than such as were used by the owners. Steamer carrying the overland mail, which left England in July, 1858, broke down, and the consequence was that the instructions sent to Melbourne did not arrive there so early by a month as was expected by the parties. Vessel arrived at Melbourne on the seventh day of August, 1858, and her cargo was all discharged and she was ready to sail in thirty days after her arrival. Master waited for the mail until the sixteenth of September, but none arrived, and then he sailed for Manilla, seeking business.
Instructions reached the master at Manilla, and on the receipt of the same the master got his vessel ready and sailed for Calcutta to fulfil the charter. Record shows that the vessel arrived there on the twenty-sixth day of February following, and that the master on the same day called on the agent of the charterers, and he declined to load the ship.
I. Two principal positions are assumed by the defendants, to show that the owners of the vessel ought not to prevail upon the merits.
1. They insist that, by the true construction of the charter-party, it was a condition precedent to the covenant or promise to load the vessel, that when the master received the instructions to fulfil the charter the vessel should be found at Melbourne disengaged, and that she should proceed direct from there with all possible despatch to the port specified in the charter.
2. Secondly, they insist that the long period which elapsed before the vessel arrived at Calcutta, although the delay was without fault either of the master or owners, discharged them as charterers from any obligation to furnish a cargo.
Nothing can be more certain than the fact that the two questions presented involve widely different considerations. Obviously, one is purely a question of construction, and must *743 be determined from the language of the charter-party when applied to the subject-matter, and considered in view of the surrounding circumstances as they existed at the time it was executed; while the other is a mixed question of law and fact, depending in a great measure upon the evidence exhibited in the record. Looking at the subject in that light, it is manifest that any commingling of the question is wholly inadmissible, and can only promote misconception and lead to confusion.
Province of construction can never extend beyond the language employed as applied to the subject-matter and the surrounding circumstances contemporaneous with the instrument.[*]
General rule is, that the terms of a contract are to be understood in their plain, ordinary, and popular sense, unless they have, in respect to the subject-matter, as by the known usage of trade, or the like, acquired a peculiar sense; but courts of justice are not denied the same light and information the parties enjoyed when the contract was executed. On the contrary, they may acquaint themselves with the persons and circumstances that are the subjects of the statements in the written agreement, and are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so to judge of the meaning of the words and of the correct application of the language to the things described.[]
Substance of the first proposition of the defendants is, that the clause, "ship to proceed from Melbourne to Calcutta, with all possible despatch," amounts to a warranty that the ship, when the instructions with the charter should be received by the master, would be found at Melbourne, and that inasmuch as she had left that port before the instructions arrived, and did not proceed from that port direct to the port of lading, they are discharged from all obligations *744 under the charter-party. Consequence of the breach of a covenant or promise on one side, which is a condition precedent, undoubtedly is that the proof of the fact is a sufficient excuse for the entire disregard of all the dependent covenants or promises by the other party. Such a construction of a charter-party is never favored by courts of justice. Whether or not a particular covenant by one party be a condition precedent, the breach of which will dispense with the performance of the contract by the other, says Lord Tenterden, is a question to be determined according to the fair intention of the parties, to be collected from the language employed by them; but an intention to make any particular stipulation a condition precedent should be clearly and unambiguously expressed.[*]
Speaking of this subject, Mr. Parsons, in the last edition of his valuable Treatise on Maritime Law, says that the doctrine of dependent covenants, as at common law, sometimes works great hardship, if not injustice, but adds, that as applied to contracts relating to shipping it is seldom laid down without a distinct and adequate reference to the intention of the parties and the actual justice of the case. Indeed, it may almost be said, remarks the same learned author, that there is a presumption of law, for there is certainly a strong disposition of the courts, against such a construction of a covenant or promise as will make it a condition precedent. Reason for the rule, as suggested by the same commentator, is that the construction which disconnects the promises and obliges each party to satisfy the other for so much of his promises as he has kept, saving his right to indemnity for any promises which are broken, will, in the vast majority of cases, do justice, complete justice, to both parties.[]
Charter-parties, it should be remembered, are commercial instruments, subject to the rules applicable to commercial contracts, where the rule of construction, as universally acknowledged, is that it shall be liberal, agreeably to the *745 intention of the parties, and conformable to the usages of trade in general, and to the particular trade to which the contract relates.[*]
Intention unquestionably is the primary consideration, and when that is ascertained, under the rules already suggested, all artificial forms of expression, as was well said in Stevens v. Curting,[] must give way. Applying these rules to the present case, it is clear, beyond controversy, that the views of the defendants cannot be sustained. Suppose it were otherwise, however, and that the construction and meaning of the charter-party, instead of being controlled by those liberal and equitable rules, to which reference has been made, and which have been followed for centuries in all commercial jurisdictions, must be determined by the application of the sternest technicalities ever applied in a common law court to a building or other construction contract, still, I am of the opinion that the clause in question cannot be construed to be a condition precedent without doing violence to the language employed by the parties, when rightly applied to the subject-matter of the contract, and justly compared with other parts of the same instrument.
The purpose of the contract was to let and hire the ship for a voyage from Calcutta to a port in the United States. Defendants had no merchandise on hand, and they had not sent out any agent to make the purchases. Time, frequently a long time, is required to purchase large cargoes in that market. Adventure was to be undertaken in a distant port which would involve great expense, and that expense would be greatly increased if the vessel or vessels were sent from the ports of the United States without a profitable outward cargo. Preference, therefore, was given by the charterers to vessels navigating in those seas. They accordingly applied to the plaintiffs; but both parties knew that it was impossible to foreknow on what precise day the vessel would arrive at her port of destination, or how long it would take *746 her to unload and get ready to sail, or the precise length of time that would be required for the voyage to Calcutta. All these matters were known to be involved in uncertainty, and it is equally obvious that they knew that the owners might not be able to forward the instructions to the master before he would arrive at Melbourne, discharge his vessel, and sail seeking business. Knowing these uncertainties, the parties incorporated into the instrument two special provisions to protect their respective interests, which was all they could safely do without incurring the hazard of defeating the main purpose they had in view.
1. Owners of the ship stipulated to use the most direct means to forward instructions to the master, with a copy of the charter, ordering it to be fulfilled, which was obviously inserted for the benefit of the charterers. Object of the provision was to insure, if possible, prompt notice to the master. But it might happen that the means of transmitting intelligence to him in that distant sea would fail until after he had sailed from the port of destination, and had engaged his ship, and in that event the owners, unless their interests were also protected by some suitable provision, would be liable at law to the defendants, or the last charterers, in damages.
2. Special provision was accordingly made, that if it happened that the ship should arrive at Melbourne before the instructions, and the master should have engaged the ship before receiving them, the charter should be null.
Both of these provisions are plainly dependent covenants, and they show to a demonstration, as was well said by Erle, Ch. J., in Seeger v. Duthie,[*] that the parties, when they intended to make a condition precedent, or a dependent covenant, knew how to carry that intention into effect. But they made no stipulation as to the time when the ship should arrive at Melbourne, nor as to the day when the cargo should be discharged, nor the day she should sail to fulfil the contract, nor the day when she should arrive at Calcutta. Stipulations *747 upon the several matters mentioned, if made, might defeat the object in view, which both parties desired to avoid, and looking at the surrounding circumstances, it is quite clear that if they had been inserted they would have been of no special importance to the defendants. They had chartered two other vessels to be employed in the same commercial adventure. When this charter was executed they had purchased no merchandise at Calcutta, and the agent they afterwards appointed to make the purchases for the three vessels was still in the United States. Charters for the other two vessels were executed about the same time as that of the Mary Bangs, and the agreed statement shows that one of them at that time was on a voyage from Liverpool to Calcutta, and the other was at Callao waiting orders. Attending circumstances negative the assumption that the interests of the charterers required anything more than ordinary expedition, and there is not a word in the charter-party to favor that view, outside of the clause under consideration.
Some stress is laid, in the opinion of the court, upon the words, "with all possible despatch," and the argument is, that they must have the same effect as a stipulation for a day certain. Covenant that the ship shall be at or sail from a certain place on a certain day, and there to receive cargo, says Mr. Parsons, is a condition precedent, and if she is not there on that day the freighter is discharged from all obligation to load her, as the condition, in that state of the case, is not fulfilled.[*] Such was the case of Glaholm v. Hays,[] decided in 1841, and referred to in the opinion of the court.
Contract, in that case, was as follows: "the vessel to sail from England on or before the fourth day of February next;" and it was held, and well held, that the clause was a condition precedent. Where, also, there is a definite statement of a material existing fact, as that "the ship is now in the port of Amsterdam," the better opinion is, that it is a *748 warranty, and not a mere representation, and consequently is synonymous with precedent condition. Decision of the Exchequer Chamber, in Behn v. Burness,[*] is to that effect, and I have no doubt it is correct. Question presented on the charter-party, say the court in that case, is confined to the statement of a definite fact, and they add that if the statement of the place of the ship is a substantive part of the contract, it seems to us that we ought to hold it to be a condition, unless we can find in the contract itself, or the surrounding circumstances, reason for thinking that the parties did not so intend. But where the stipulation as to time is not of a day certain, or where the statement relied on is not of an existing fact, or is expressed in indefinite terms, the rule is otherwise by all the authorities. Take, for example, the case of Constable v. Cloberie,[] which is an early case upon the subject. Covenant was to sail with the first wind, and the covenant was not performed; but the court held that the covenant was not a condition precedent.
Material clause of the charter-party in Bornman v. Tooke,[] was "to sail with the first favorable wind direct to the port of Portsmouth;" but the ship deviated, and unnecessarily entered another harbor, where she was detained several weeks, by means whereof the charterer was put to additional expense for insurance upon the cargo. Held, that the covenant to sail, as above, was not a condition precedent, and that the deviation could not be given in evidence in bar of the action.
Origin of the true criterion by which to determine whether a particular covenant is to constitute a condition precedent or not, is to be found in the case of Boone v. Eyre,[§] which was decided by Lord Mansfield. Where mutual covenants go to the whole of the consideration on both sides, said the judge, they are mutual conditions, the one precedent to the other. But where they go only to a part, as where a breach may be paid for in damages, there the defendant has *749 a remedy on the contract, and shall not plead it as a condition precedent. Same rule was laid down by Lord Ellenborough in Ritche v. Atkinson,[*] decided twenty years later. Stipulation, in that case, was that the ship should, "with all convenient speed, sail and proceed" to a certain port, and there take on board a complete cargo, and therewith proceed to another port and deliver the same, and the evidence showed that she did not bring home more than half what she could have carried. Judgment was that the covenant was not a condition precedent, but that the master might recover freight for a short cargo at the stipulated rates, subject to the right of the freighter to recover damages for such short delivery.
Ruling of Lord Ellenborough in Havelock v. Giddes et al.,[] is to the same effect. Covenant of the owner in that case was, that he would "forthwith at his own expense make the ship tight and strong," and it appeared that the owner was in default. Decision was that the covenant was not a condition precedent, but merely gave the charterers a right in a counter action to such damages as they could prove they had sustained from the neglect. Subsequently the same question was presented for a third time to the same court in Davidson v. Gwynn,[] and it was ruled in the same way. Particular phrase in that case was, "to sail with the first convoy," and the master neglected to do as directed. Seriatim opinions were delivered by the judges, and they all held that it was not a condition precedent, but a distinct covenant, for a breach of which the party injured might be compensated in damages. Nonperformance on one side, in order to justify the conclusion that the stipulation requiring it is a condition precedent, must go to the entire substance of the contract, and to the whole consideration, so that it may safely be inferred as the intent and just construction of the contract, that if the act to be performed on the one side is not done, there is no consideration for the stipulation on the other side. Proof of the breach of an express or implied *750 covenant on one side is not sufficient, not even if it is attended with some loss and damage to the other, because if it does not go to the whole consideration, and the loss can be compensated in damages, the construction must be that the stipulation is independent, and the losing party, under such circumstances, is not absolved from performance on his part[*]
Repeated decisions confirm this rule, and indeed it may almost be said that it is universally approved. Reference will now be made to some of the more modern cases decided in the courts of the parent country. Excuse for that course, if any be needed, will be found in the opinion of the court, which assumes that those cited by the defendants are inconsistent with those cited by the plaintiffs, which in my judgment is error. Plaintiffs refer to Freeman v. Taylor,[] which is regarded as a leading case.
Terms of the charter-party were that the ship should proceed to the Cape of Good Hope, and having there discharged cargo, should "proceed with all convenient despatch to Bombay," where the freighter engaged to put on board a cargo of cotton for England. Master, instead of conforming to the stipulation, wilfully deviated, causing a delay of six weeks, and in consequence of the deviation the agent of the defendants refused to load the vessel. Case was tried before Tindal, Chief Justice, and he charged the jury that, inasmuch as the freighter might bring his action against the owner and recover damages for any ordinary deviation, he could not for such a deviation put an end to the contract; but if the deviation was so long and unreasonable that, in the ordinary course of mercantile concerns, it might be said to have put an end to the whole object the freighter had in view in chartering the ship, in that case the contract might be considered at an end, and he left it to the jury to decide whether the delay was of such a nature as to have put an end to the ordinary objects the freighter might have had in view when he entered into the contract.
*751 Rule nisi, to set aside the verdict, was granted, but the whole court held that the instructions were right. Precisely the same views were expressed by Lord Denman and his associates in Clipsham v. Vertue et al.,[*] which is admitted to be in point for the plaintiffs. Stipulation in the charter was to load and "forthwith proceed to the port of destination." Delay ensued and the charterers refused to load. Suit was brought by the owners, and the defendants pleaded that the vessel did not arrive at the port of lading until after an unreasonable delay. Plaintiffs demurred, and the plea was held bad because it did not show that the delay frustrated the voyage.
Reliance is placed by the defendants upon the case of Oliver v. Fielden et al.,[] which was decided in 1849, by Pollock, C.B., and his associates. Essential clause of the charter party, dated the 28th of March, 1848, was that the ship, then on the stocks at Quebec, should "be launched and ready to receive cargo in all May" next following the date of the charter. Action was by the owners for a refusal to load. Plea that "the ship was not launched and ready to receive cargo in all May," as stipulated. Demurrer by plaintiff and joinder by defendants.
Court held that the readiness to receive cargo in all May was a condition precedent. Beyond question the ruling was correct upon the ground that a definite limitation of time is precisely equivalent in principle to a day certain. Pleadings, therefore, presented a case where the condition precedent was clearly and unambiguously expressed. Authorities cited by the court furnish indubitable evidence that such was the view taken of the case at the time of the decision. They cited Glaholm v. Hays,[] and Olive v. Booker,[§] where the decision turned upon a statement material in character and of an existing definite fact.
Statement was that the vessel is "now at sea, having sailed three weeks ago, or thereabouts," which was a material *752 statement and wholly untrue, and the court held that it was a warranty, and it is not possible to see how it could have been held otherwise. Unless I am greatly mistaken, these explanations are sufficient to show that the case or Oliver v. Fielden et al., and the cases therein referred to by the court, run entirely clear of the question involved in this case. Should further confirmation of the proposition, however, be needed, it will be found in the case of Terrabochia v. Hickie,[*] decided in 1856, by the same court which seven years previously decided the case of Oliver v. Fielden et al., on which the defendants rely.
Provision of the charter-party was, that the ship "being tight, stanch, and strong, and every way fitted for the voyage, should, with all possible speed, sail and proceed" to a certain port, and there load a full and complete cargo in the customary manner. Breach alleged was, that the defendants made default in loading the agreed cargo. Second plea was, that the ship did not, with convenient speed, or in a reasonable time in that behalf, sail or proceed to the port of lading, insomuch that by reason thereof the object of the charter-party and of the voyage was wholly frustrated. Issue was joined and the parties went to trial. Jury found 
1. That the vessel did not proceed with reasonable speed and diligence.
2. That the whole object of the voyage was not thereby defeated.
3. That the vessel was not fitted for her voyage when she sailed for the port of lading, but that she was so fitted when she arrived at that port.
Verdict was entered for the defendant, with leave to the plaintiff to move to enter a verdict in his favor. Rule to show cause was accordingly granted, and the questions were fully argued. Separate opinions were given by Pollock, C.B., and his associates, and they unanimously decided that the stipulation referred to was not a condition precedent. Opinion of the Chief Baron is a very able one, going over *753 the whole ground and reviewing the principles involved in all the preceding cases. All of the cases decided prior to 1857, when the judgment was given for the plaintiff, were cited at the argument, and it does not appear to have even occurred to the learned Baron that he was guilty of any inconsistency in pronouncing the judgment.
Special reference was made to the remark of Maule, J., in Glaholm v. Hays,[*] that if the covenant to sail on a day certain was a condition precedent, then it might be said that a covenant to sail in a reasonable time should be held to have the same effect; and the answer to the suggestion, if such the remark can be called, was that the distinction between the two cases was obvious, which in my judgment is a sufficient answer to every argument of the kind.[]
Repetition of the explanation as to what the distinction is, it seems to me, is unnecessary, as it has already been stated in language as clear as I can employ. Same distinction is explained by Erle, Ch. J., in Seeger v. Duthie,[] in a manner entirely satisfactory. Principle of the distinction, as explained in the case of Dimech v. Cortlett,[§] is that a contract that a thing shall be done on a day named is in itself certain and defined, because it excludes all consideration of future circumstances; and the same remark is equally applicable to a positive statement of a definite existing fact, if it is material to the object of the instrument. But a contract that the thing shall be done with all convenient speed, say the court, necessarily admits a consideration of all the future circumstances; and different minds may plausibly enough come to different conclusions as to what is "all convenient speed." Execution of the charter-party in that case was at Malta. Clauses to be noticed are as follows:
1. That the ship is "now at anchor in this port."
2. That she shall, "with all convenient speed, proceed in ballast to Alexandria, in Egypt, and there load a full cargo."
*754 Report of the case shows that she was neither at anchor in port nor entirely coppered, but was then in a dry-dock undergoing repairs. Failure to furnish the cargo was the ground of the action, and the decision in the colonial court was against the owner, who prosecuted the appeal. Questions were fully argued, and all the authorities of a date prior to the judgment, which was pronounced in 1858, were reviewed. Conclusion was that neither of the stipulations was a condition precedent, but the decision in respect to the first one turned upon the question of intention, as collected from the whole instrument. Ruling on the second point was undoubtedly correct. Opinion was given by Sir John T. Coleridge. He first stated the propositions submitted by the plaintiff, which were that the failing to sail within a reasonable time or with convenient speed was no answer to the action on the contract, and that the case was governed by the general law of mercantile contracts. Having stated the propositions he proceeds to say: "We agree to both parts of the argument. Parties," said the judge, "have not in this case expressly stated for themselves in the charter-party that unless the vessel sailed by a specified day the charter-party should be at an end, and courts ought to be slow to make such a stipulation for them." Court of Exchequer also recognized the same distinction in the case of Crookewit v. Fletcher et al.,[*] decided in 1857. Words of the charter-party were, ship "now in Amsterdam, and to sail from thence for Liverpool on or before the 15th of March next," and the court held, on the authority of Glaholm v. Hays, Olive v. Booker, and Oliver v. Fielden et al., that the stipulation as to sailing on the day named was a condition precedent, but the court expressly say, "We entirely agree with the judgment of the Lord Chief Baron, in Terrabochia v. Hickie, who clearly points out the distinction between a stipulation to sail on a particular day and any general stipulation as to sailing `in a convenient time,' or other words of the same description."[] *755 Some answer ought to be given to this long and unbroken course of judicial decisions almost unparalleled for their ability and consistency in any other branch of commercial law. Attempt is made to furnish an answer, and what is it?
1. Suggestion is made that the phrase, "with all possible despatch," is more intensified than any of the expressions found in the cases cited by the plaintiffs. Shadowy as the theory appears, still it deserves to be examined on account of the source from which it is suggested. None will pretend, I suppose, that the phrase "with all possible despatch" is more intensified than the phrase "as soon as possible," which is one of daily use; and yet it was held, in the case of Atwood et al. v. Pomeroy,[*] decided in 1856, that the latter phrase means within a reasonable time, regard being had to the surrounding circumstances; and it is not believed that there is a decision to the contrary in any jurisdiction where our language is spoken. Considered in the light of that decision, it is obvious that the suggestion is entirely unsubstantial and without merit. Another suggestion is that the contract was not to attach at all, unless the master received the instruction before he sailed. But the parties inserted no such stipulation into the charter-party, and I think that courts of justice ought to be slow to make such a stipulation for them.[]
They provided that if the ship happened to arrive at the port of discharge before the instructions, and the master should have engaged his ship before receiving them, the charter should be null, but they made no other provision for the termination of the charter, and it is confidently believed that the suggestion is utterly inconsistent, not only with the intent of the parties, but with the whole scope and purpose of the instrument. Suppose the vessel had sailed direct for Calcutta, and the day after the vessel left the wharf at the port of discharge she had met the British steamer and the master had received his instructions, or suppose the ship, instead *756 of being met on the day after she sailed, had proceeded on her voyage and touched at Singapore or Batavia, and the master had received his instructions at one or the other of those places, or suppose the ship, instead of touching at one of those ports, had proceeded direct to Calcutta, and on her arrival there the master had met his instructions and had immediately tendered the ship, under the charter-party, all would agree, I think, that it would be impossible to hold, if the defendants had refused to load, that they would not have been liable on the covenants of the charter-party. Would any one pretend, in the case last supposed, that if the master, instead of tendering the ship, had refused to fulfil the charter, that the owners would not have been liable? I think not, and yet, if they would have been liable in the case supposed, it can only be upon the ground that the clause in question is not a condition precedent, because the proposition concedes that the charter attached, notwithstanding the ship had sailed.
Defendants also suggested at the argument that the case of Graves v. Legg,[*] decided in 1854, was inconsistent with the rights of the plaintiffs to recover; but I think not, for several reasons.
1. Because it has no application to the case, being an action upon an ordinary written agreement, and not upon a charter-party.
2. Because, if it were inconsistent with the cases cited for the plaintiffs, the later cases ought to be regarded as furnishing the true rule.
3. Because the decision is perfectly consistent with the earlier and later cases to which reference has been made.
Agreement of plaintiff was to sell to the defendant certain merchandise, to be shipped with all despatch, "and the names of the vessels to be declared as soon as the goods were shipped." Names of the vessels were not notified to the defendants, and they refused to accept the goods. Held that the provision in the contract that the names of the vessels should be *757 declared as soon as the goods were shipped was a condition precedent to the obligation of the defendants to accept and pay for the goods. Judgment was delivered by Parke, B., and he approved the rule laid down in Boone v. Eyre, as the criterion for determining whether a particular covenant is independent or a condition.
Result of my examination is that I find no inconsistency between the cases cited by the defendants and those cited by the plaintiffs. Supposed difference consists only in the application, and therefore is unreal. Doubts were expressed in Behn v. Burness, whether the first point ruled in Dimech v. Cortlett was correct, but the court finally came to the conclusion that their decision did "not at all conflict" with the decision of the Privy Council, even on that point. First point decided, it will be remembered, was that the statement that the ship is "now at anchor in this port" was not a warranty, which has no application whatever in this case. Second point decided in that case, which is the one applicable here, was not questioned either by the bar or the bench, and is undoubted law.[*] For these reasons I am of the opinion that the clause in question is not a condition precedent.
II. Second objection is that the delay which ensued before the vessel arrived at Calcutta discharged the charterers from all obligation to furnish a cargo. Moral wrong is not imputed to the plaintiffs, and it is quite clear on the facts that perfect justice is done to both parties by regarding the provision as an independent stipulation. Contrary conclusion is a great hardship, as the master acted in good faith, and employed his best exertions, after he received his instructions, to fulfil the charter. Granting that the provision is not a condition precedent, then the rule is that unless the deviation was of such a nature and description as to frustrate the voyage or to deprive the freighter of the benefit of his contract, he is not discharged from the obligation, but is remitted to his claim in damages for any injury he may have *758 sustained.[*] Applying that rule to the case it is quite obvious what the result ought to be.
Agent of the defendants arrived at Calcutta on the twenty-fifth of August, and remained there till the twenty-third of January following. Names of the other vessels were the J.P. Wheeler and the William Cummings. Former arrived on the fourth of November, and the latter on the first of the following month. When the William Cummings arrived the agent had purchased, of certain articles, enough for two ships, but he had not purchased any saltpetre for ballast. Part of the merchandise so purchased was intended for the Mary Bangs, but it was all sent by the other two vessels. Plaintiffs' ship arrived, as before stated, and the agent of the defendants refused to load her. Freight at that time had fallen for such a voyage to five or six dollars. Under those circumstances the agent refused to load the ship, but he immediately chartered another vessel of about the same tonnage to take her place, and loaded the vessel so chartered with the funds provided to purchase a cargo for the Mary Bangs, and the parties agree that the whole cargo was purchased after the vessel of the plaintiffs arrived.
Defendants do not venture to suggest that they have suffered any injury, and it is clear that the construction here assumed would, in the language of Mr. Parsons, "do justice, complete justice, to both parties." Unless the instructions were received by the master before the vessel sailed seeking business it must have been understood by the defendants that some delay would necessarily ensue in the departure of the vessel; and if, in that contingency, they had been unwilling to accept the contract, the reasonable presumption is that they would have insisted that some more specific provision upon the subject should have been inserted in the charter-party. They understood the nature and effect of a condition precedent, and if they had intended that the contract *759 should be null in case the vessel sailed before the master received advices, it must be assumed that they would have said so, "in clear and unambiguous terms."
The truth is, they intended no such thing, but the theory here adopted speaks the true intent and meaning of the contract.
Pursuant to these views I think the judgment should be affirmed.
NELSON, J., also dissented.
NOTES
[*] Seegur v. Duthie, 8 Common Bench, N.S., 63.
[] Crookewit v. Fletcher, 1 Hurlstone & Norman, 912.
[] 10 East, 295.
[§] Stavers v. Curring, 3 Bingham's New Cases, 355
[*] Simpson v. Henderson et al., 1 Moody & Malkin (22 English Common Law), 313; Hasbrook v. Paddock, 1 Barbour S.C. 635; French v. Carhart, 1 Comstock, 105.
[*] Barreda et al. v. Silsbee et al., 21 Howard, 161.
[] Shore v. Wilson, 9 Clark & Finnelly, 569; Clayton v. Grayson, 4 Neville & Manning, 606; Addison on Contracts, 846.
[*] Abbott on Shipping (Ed. 1854), 368.
[] 1 Parsons's Maritime Law, 272.
[*] Abbott on Shipping, 352.
[] 3 Bingham's New Cases, 355.
[*] 8 J. Scott, N.S., 65.
[*] 1 Parsons' Maritime Law, 271.
[] 2 Manning & Granger, 257.
[*] 8 Law Times, N.S., 207.
[] Palmer, 397.
[] 1 Campbell, 376.
[§] 1 H. Blackstone, 273
[*] 10 East, 295.
[] 10 East, 555.
[] 12 East, 381.
[*] Mill-dam Foundry v. Hovey, 21 Pickering, 439; Bennet v. Pixley, 7 Johnson, 249; Smith's Mercantile Law (6th London ed.), 312, 324.
[] 8 Bingham, 124
[*] 5 Adolphus & Ellis, N.S., 265.
[] 4 Exchequer, 135.
[] 2 Manning & Granger, 257.
[§] 1 Id. 416.
[*] 1 Hurlstone & Norman, 183.
[*] 2 Manning & Granger, 263.
[] Same v. Same, 38 English Law & Equity, 339; Hurst v. Usborne, 18 C.B., 144.
[] 8 J. Scott, N.S., 64.
[§] 12 Moore, Privy Council, 228.
[*] 40 English Law and Equity, 415.
[] Same v. Same, 1 Hurlstone & Norman, 912.
[*] 1 J. Scott, N.S., 110.
[] Dimech v. Cortlett, 12 Moore, Privy Council, 227
[*] 9 Exchequer, 709.
[*] Adams v. Royal Company, 5 C.B.N.S. 492.
[*] Freeman v. Taylor, 8 Bingham, 124; Clipsham v. Vertue, 5 Adolphus & Ellis, N.S., 265; Seegar v. Duthie, 8 J. Scott, N.S., 45; Terrabochia v. Hickie, 1 Hurlstone & Norman, 183; Dimech v. Cortlett, 12 Moore, Privy Council, 227.